Belknap
No. 2004-110

THE STATE OF NEW HAMPSHIRE

v.

STEVEN GUBITOSI

Argued: June 22, 2005
Opinion Issued: October 28, 2005

*Kelly A. Ayotte*, attorney general (*Stephen D. Fuller*, senior assistant attorney general, on the brief, and *Robert S. Carey*, assistant attorney general, orally), for the State.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the defendant.

DUGGAN, J. The defendant, Steven Gubitosi, appeals his conviction for one count of stalking, *see* RSA 633:3-a, I(a) (Supp. 2004), following a jury trial in the Superior Court (*Manias*, J.). We affirm.

The jury could have found the following facts. The defendant began dating the victim, Martha Rubin, during the summer of 2000. Rubin ended their relationship in April 2002. Soon thereafter, Rubin began receiving

telephone calls from the defendant on her home telephone and cell phone. During the summer of 2002, the defendant called Rubin numerous times each day. The calls "started to become threatening in nature," making Rubin fear for her safety. She changed the locks on her doors several times and often felt as though she was being followed.

On July 11, 2002, Rubin spoke to Officer William Dexter at the Concord Police Department about the telephone calls. She also described a recent incident in which the defendant had appeared at her home, asked her to step outside for a moment, then took her hand and placed it on the small of his back, where he had a firearm secured. While Rubin was talking with Officer Dexter, the defendant called her cell phone. Officer Dexter, who knew the defendant from his work as a police officer in Pembroke, took the phone and told the defendant that Rubin did not want to receive any more calls from him and that if he continued to call her, the police would file charges against him. Despite the officer's warnings, the defendant continued to telephone Rubin.

On September 19, 2002, Rubin and her boyfriend, Brian Kane, went to Zack's restaurant in Tilton to meet their friend, Kathleen Companion, for dinner. While Rubin and Kane were sitting in the bar area waiting for Companion to arrive, they saw the defendant's gold Lincoln Town Car drive through the parking lot. Rubin and Kane both recognized the car and the license plate number. Rubin also saw the driver's profile and the flash of his glasses. She testified that seeing the defendant's car that night made her feel "[f]earful, angry, [and] frustrated." Rubin and Kane then moved into the dining area of the restaurant where they could watch over Kane's car, which had been damaged in the past.

Companion arrived at the restaurant shortly before 8:00 pm and sat with Rubin and Kane in the dining area. Companion went to the bar to get a drink. The bartender was on the telephone. The bartender passed the phone to a waitress, who spoke briefly on the phone and then asked Companion if her name was Martha. When Companion replied that it was not, the waitress said that the person on the telephone was asking for Martha Rubin. Companion took the telephone from the waitress, listened briefly and recognized the person on the other end as the defendant. She told him to "[k]nock it off" and to "grow up," then the phone went dead. The defendant's cellular telephone records show that the defendant called the number for Zack's restaurant at 8:03 pm that night.

Companion returned to the table and told Rubin about the phone call. Companion then called the defendant and left him a message on his voicemail. When the defendant returned the call, he denied that he had called the restaurant and driven through the parking lot.

In October 2002, as part of its investigation into Rubin's allegations against the defendant, the Attorney General's office sent a subpoena duces tecum to U.S. Cellular. The subpoena required U.S. Cellular to provide "[s]ubscriber toll information on outgoing phone calls" from April 12, 2002, through October 18, 2002, for the defendant's cell phone number.

Prior to trial, the defendant filed a motion to suppress the phone records that U.S. Cellular had given to the State in compliance with the subpoena. The trial court denied the defendant's motion.

On appeal, the defendant argues that: (1) the trial court erred in admitting into evidence phone records obtained from U.S. Cellular; (2) the subpoena of the defendant's phone records was overbroad; (3) the evidence presented at trial was insufficient to find guilt beyond a reasonable doubt; and (4) the defendant was improperly charged with an inchoate act as part of a course of conduct under the stalking law. *See* RSA 633:3-a, II(a) (Supp. 2004).

The State argues that: (1) the defendant had no reasonable expectation of privacy in the telephone records obtained from U.S. Cellular; (2) the defendant does not have standing to challenge the breadth of the subpoena directed at U.S. Cellular and, even if he does, it was not overbroad; (3) the evidence at trial was sufficient to prove the defendant guilty beyond a reasonable doubt of stalking under RSA 633:3-a, I(a); and (4) the defendant's telephone call to the restaurant constituted an act as part of a course of conduct under RSA 633:3-a, II(a). We agree with the State.

*I. Subpoena of phone records*

The defendant argues that the trial court should have suppressed the telephone records because the State obtained them without a warrant or probable cause in violation of his right to privacy under Part I, Article 19 of the New Hampshire Constitution. Our review of the trial court's order on a motion to suppress is *de novo*, except as to any controlling facts determined at the trial court level in the first instance. *State v. Goss*, 150 N.H. 46, 47 (2003).

■ The defendant argues that he had a reasonable expectation of privacy in the telephone billing records obtained from U.S. Cellular. We recently adopted an expectation of privacy analysis for claims under Part I, Article 19: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 49 (quotation omitted); *see Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

In *State v. Valenzuela*, we held that the government's use of a pen register to record and disclose the numbers dialed from a telephone does not constitute a search under Part I, Article 19 of the State Constitution. *State v. Valenzuela*, 130 N.H. 175, 189 (1987), *cert. denied*, 485 U.S. 1008 (1988). We relied, in part, upon the United States Supreme Court's holding in *Smith v. Maryland*, 442 U.S. 735, 745-46 (1979), that the use of a pen register is not a search within the meaning of the Fourth Amendment because the defendant has no legitimate expectation of privacy in the phone numbers dialed to make outgoing telephone calls. *See Valenzuela*, 130 N.H. at 184. Although we did not explicitly adopt an expectation of privacy framework under Part I, Article 19, we concluded that the defendant had no reasonable expectation of privacy in the information that was conveyed to the telephone company when he made an outgoing telephone call. *Id.* at 181.

 With regard to pen registers, we noted that the coded signals sent from the defendant's telephones to the phone company for the purpose of enabling it to connect a call must be distinguished from the contents of communications transmitted over the telephone company's lines and addressed to the recipients of the completed call. *Id.* at 183. We observed that

> [i]t is obvious, and is indeed undisputed, that no constitutionally protected privacy would have been infringed, and no search conducted, if the telephone company had informed the government of numbers orally communicated by [the defendant] to an operator. . . . The same conclusion should follow by analogy when a pen register installed on the company's wire informs the government of the decoded messages communicated to the company through the use of the company's dialing and switching equipment. The only distinction between the two cases is the use of mechanical rather than human receptors of the message intended to inform the company of the caller's desired connection, and such a distinction should make no difference for constitutional purposes.

*Id.* Thus, we concluded that when a defendant communicates information to the telephone company in order to make the telephone system work for him, there is no violation of a protected privacy interest when the record of that information is later disclosed. *Id.* at 188-89. Likewise, the defendant does not have a reasonable expectation of privacy in information concerning his cellular telephone calls that was recorded for billing

purposes and retained by U.S. Cellular in the ordinary course of its business.

The defendant asks us to reconsider our holding in *Valenzuela* in light of our holding in *Goss* that a person has a reasonable expectation of privacy in garbage bags left in front of a residence for collection. *See Goss*, 150 N.H. at 49. He points to our observation in *Goss* that "[p]ersonal letters, *bills*, receipts, prescription bottles and similar items that are regularly disposed of in household trash disclose information about the resident that few people would want to be made public" to support his argument that he has a reasonable expectation of privacy in the billing records held by U.S. Cellular. *Id.* (emphasis added).

We decline the defendant's invitation to overrule *Valenzuela* for two reasons. First, "[t]he doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." *Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 504 (2003) (quotations omitted). Thus, when asked to reconsider a previous holding, the question is not whether we would decide the issue differently *de novo*, but "whether the ruling has 'come to be seen so clearly as error that its enforcement was for that very reason doomed.'" *Id.* at 504-05 (quoting *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 854 (1992)).

The defendant has failed to demonstrate that our holding in *Valenzuela* meets this stringent standard. *See id.* He correctly notes that some States have declined to follow the Supreme Court's holding in *Smith* and have instead held, under their respective state constitutions, that people have a legitimate expectation of privacy in the numbers they dial when making telephone calls. *See, e.g., State v. Gunwall*, 720 P.2d 808, 816 (Wash. 1986). We addressed these decisions and their criticisms of *Smith* in *Valenzuela* and concluded that "the *Katz* conception of protected privacy, if applied through article 19, would not limit the use of a pen register to obtain the numbers that a defendant dials on his telephone." *Valenzuela*, 130 N.H. at 189. The defendant points to no other legal developments since *Valenzuela* that would justify abandoning our holding. While we agree with the dissent that there are persuasive policy arguments to overrule *Valenzuela*, "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided." *Casey*, 505 U.S. at 864. Moreover, nothing in today's decision prevents the legislature from closely regulating subpoenas for phone records. *See* RSA 7:6-b, I(c) (2003) (requiring communication common carrier to furnish to the attorney general upon the written demand of the attorney general certain information that the attorney general "has reasonable grounds for belief

that the service furnished . . . has been, is being, or may be used for an unlawful purpose.").

Second, we conclude that *Goss* is distinguishable. *See Goss*, 150 N.H. at 49. In *Goss*, we emphasized that the mere possibility that someone might open and rummage through garbage containers left out for regular collection does not negate the homeowner's expectation of privacy in their contents. *Id.* We also noted that it is "reasonable to expect that those who are authorized to remove trash will do so in the manner provided by ordinance or private contract." *Id.* at 50 (quotation omitted). The same considerations do not apply here. Rather, we hold that the defendant does not have a reasonable expectation of privacy in billing records that were never in his possession and that only contain information that he voluntarily conveyed to U.S. Cellular in order to make use of its telephone service. *See Valenzuela*, 130 N.H. at 189. The concurring opinion continues to disagree with *Goss*, which, of course, is settled law. The concurring opinion goes on to reiterate the major points in this opinion, providing additional citations that support our analysis and conclusion.

■ Finally, the defendant argues that he had a heightened expectation of privacy in the telephone billing records because he had an unlisted telephone number. In *Smith*, the petitioner similarly argued that he demonstrated a subjective expectation of privacy because he used the telephone in his house to the exclusion of all others. *Smith*, 442 U.S. at 743. The Supreme Court observed that

> the site of the call is immaterial for purposes of analysis in this case. . . . Regardless of his location, petitioner had to convey [the] number to the telephone company in precisely the same way if he wished to complete his call. The fact that he dialed the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would.

*Id.* Likewise, the fact that the defendant used his cellular telephone, which had an unlisted number, to make the telephone calls has no bearing on whether he had a reasonable expectation of privacy in the billing records obtained from his telephone service provider.

*II. Overbreadth of subpoena*

The defendant also argues that, under Part I, Article 19 of the State Constitution and the Fourth Amendment to the United States Constitution, the telephone records should have been suppressed because the subpoena issued to U.S. Cellular was overbroad. The subpoena covered

the period of time from April 12, 2002, through October 18, 2002. The defendant was later charged with stalking based upon incidents that occurred on September 19, 2002. He argues that the subpoena should have been restricted to records for that date and that the trial court allowed the State to engage in a "fishing expedition."

The State argues that the defendant lacks standing to pursue this claim because he does not have a legitimate expectation of privacy in the records obtained from U.S. Cellular. We agree.

■ The threshold question as to the determination of a party's standing to challenge the introduction of evidence by means of a motion to suppress is whether any rights of the moving party were violated. *State v. Flynn*, 123 N.H. 457, 466 (1983). We first address the defendant's claims under our State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). A defendant may have standing based upon (1) being charged with a crime in which possession of an item or thing is an element, which confers automatic standing, or (2) having a legitimate expectation of privacy in the place searched or the item seized. *See State v. Alosa*, 137 N.H. 33, 36-37 (1993).

■ As discussed above, the defendant did not have a reasonable expectation of privacy in the records obtained from U.S. Cellular. Thus, we conclude that he does not have standing to claim that the subpoena was overbroad. *See id.* Because the Federal Constitution affords no greater protection in this context, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Ball*, 124 N.H. at 232; *Smith*, 442 U.S. at 745-46.

*III. Sufficiency of evidence*

The defendant argues that there was insufficient evidence to prove the acts alleged in the indictment that constitute a course of conduct for the stalking charge. In an appeal challenging the sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Flynn*, 151 N.H. 378, 382 (2004). We examine each evidentiary item in the context of all the evidence, not in isolation. *Id.* It is well settled that the jury has substantial latitude in determining the credibility of witnesses. *Id.* The jury may accept some parts and reject other parts of testimony, and adopt one or the other of inconsistent statements by witnesses. *Id.*

The defendant was convicted of one count of stalking. *See* RSA 633:3-a, I(a). RSA 633:3-a, I(a) provides:

A person commits the offense of stalking if such person ... [p]urposely, knowingly, or recklessly engages in a course of conduct targeted at a specific person which would cause a reasonable person to fear for his or her personal safety or the safety of a member of that person's immediate family, and the person is actually placed in such fear.

A "course of conduct" is defined as "2 or more acts over a period of time, however short, which evidences a continuity of purpose." RSA 633:3-a, II(a). The indictment alleged two acts to prove a course of conduct: (1) the defendant drove to a restaurant where Rubin was; and (2) the defendant attempted to telephone her there after being told by police not to contact her. Whether the defendant engaged in a course of conduct targeted at Rubin that would cause a reasonable person to fear for his or her personal safety is a question of fact for the jury to decide. *See State v. Scognamiglio*, 150 N.H. 534, 536 (2004).

The following evidence was presented at trial to support the allegation that the defendant drove to the restaurant where Rubin was eating on September 19, 2002. Rubin and Kane testified that they saw the defendant's gold Lincoln Town Car drive through the parking lot of Zack's restaurant. Rubin testified that the car was approximately three car lengths away from her and that it was leaving the restaurant parking lot and turning onto the main road when she saw it. She also testified that she saw the driver's profile and the flash of his glasses as the car passed in front of the restaurant window. Kane testified that he had seen the defendant's car on several prior occasions, he was familiar with the license plate number and he had a good view of the defendant's car and the license plate through the restaurant window.

With regard to the telephone call, Companion testified that the voice on the restaurant's telephone sounded like the defendant's voice. She testified that she listened to the speaker for a short amount of time, that Rubin's name was mentioned, that she then identified herself as Kathy and told the person on the other end to "[k]nock it off" and "grow up." The telephone records, which were admitted into evidence, showed that the defendant had called the number for Zack's restaurant that night. Officer Dexter also testified that he had spoken to the defendant previously and told the defendant that Rubin did not want to receive any more telephone calls from him and that she wanted to be left alone.

■ The evidence, viewed in the light most favorable to the State, supports the verdict of guilty. *See id.* at 537. A rational trier of fact could have found beyond a reasonable doubt that the defendant knowingly engaged in a course of conduct targeted at Rubin by driving through the

parking lot of the restaurant where she was and then calling the restaurant and asking to speak to her. *See* RSA 633:3-a, I(a). The defendant argues that the jury may have relied upon evidence that was equivocal, including Companion's identification of his voice over the telephone, as well as evidence of uncharged conduct such as voicemail messages that the defendant left on Rubin's phone. Although there may have been some inconsistencies in the evidence presented, "[i]t is the jury which observes the witnesses, judges their credibility and hears their testimony, accepting or rejecting it in whole or in part." *State v. Mason*, 150 N.H. 53, 56 (2003) (quotation omitted). Likewise, once the evidence of uncharged conduct was admitted, the jury was entitled to use the evidence, consistent with the trial court's instructions, as it saw fit. *See State v. Monroe*, 146 N.H. 15, 17 (2001). "Generally, in this State, the path a jury follows to a verdict and the evidence it considers while deliberating are not subject to the court's control." *Id.* Thus, we reject the defendant's argument that the State failed to meet its burden of proving guilt beyond a reasonable doubt.

*IV. Inchoate act*

Finally, the defendant argues that he was improperly charged with an inchoate act under RSA 633:3-a, II(a) (defining "[c]ourse of conduct" for purposes of the stalking law). He contends that the allegation that he attempted to telephone Rubin at the restaurant is an attempted act and thus cannot be part of the course of conduct upon which the indictment was based.

In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *State v. Clark*, 151 N.H. 56, 57 (2004). We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. *Id.* We construe Criminal Code provisions "according to the fair import of their terms and to promote justice." RSA 625:3 (1996); *see State v. Hudson*, 151 N.H. 688, 690 (2005). "Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *State v. Whittey*, 149 N.H. 463, 467 (2003) (quotation omitted).

RSA 633:3-a, II(a)(7) provides that a course of conduct may include any act of communication as defined in RSA 644:4, II (Supp. 2004). Under RSA 644:4, II, "communicates" means "to impart a message by any method of transmission, including but not limited to telephoning." The statute does not require that the act of communication take place between the defendant and the intended victim. Thus, it was sufficient for the State

to prove that the defendant telephoned the restaurant with the intent to impart a message to Rubin and that the telephone call was part of a course of conduct that reasonably made Rubin fear for her safety. *See* RSA 633:3-a, I(a).

*Affirmed.*

DALIANIS, J., concurred; BRODERICK, C.J., concurred specially; NADEAU and GALWAY, JJ., dissented.

BRODERICK, C.J., concurring specially. I agree with the lead opinion that the defendant's conviction for stalking should be affirmed. I write separately, however, because I continue to believe that *State v. Goss*, 150 N.H. 46 (2003), which the lead opinion attempts to distinguish and upon which the dissent in part relies, was wrongly decided. In my judgment, the defendant in *Goss* had no objectively reasonable expectation of privacy in his trash, no matter what it contained, when left for pick-up adjacent to a public thoroughfare. While the defendant in *Goss* might have understandably wished that his trash would remain off-limits to third parties, including law enforcement, that did not transform his desire into a reasonable, real-world expectation entitled to constitutional protection. When confronted with this same issue, the United States Supreme Court agreed. *See California v. Greenwood*, 486 U.S. 35, 41 (1988).

Here, the defendant seeks to cloak telephone billing records, possessed and maintained by U.S. Cellular in the regular course of its business, in a reasonable expectation of privacy that can only be breached by a warrant based upon probable cause. As much as I share the defendant's desire for privacy, I am not persuaded that such business records are so shielded. I believe that a real difference in expectations exists between the *content* of a phone call and the mechanical recording of *numbers dialed* for billing purposes for use by the telephone company. The United States Supreme Court described this distinction in *United States v. New York Telephone Co.*, 434 U.S. 159, 167 (1977):

> Pen registers do not "intercept" because they do not acquire the "contents" of communications . . . . Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers.

Although the telephone numbers disclosed in Mr. Gubitosi's case were obtained through his billing records, as opposed to a pen register, and an inference could be made from the billing records that a conversation may have ensued, the analysis is the same—in neither case is the call's content revealed.

In my judgment, the disclosure of telephone numbers here is comparable to the viewing of addresses on letters deposited in the mails. In *Ex parte Jackson*, the Supreme Court held that law enforcement could not, absent a warrant, open letters to search for contraband. "Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, *except as to their outward form and weight*, as if they were retained by the parties forwarding them in their own domiciles." *Ex parte Jackson*, 96 U.S. 727, 733 (1877) (emphasis added).

Indeed, in *United States v. Miller*, 425 U.S. 435 (1976), the Supreme Court held that cleared checks and deposit slips in the possession of financial institutions were subject to subpoena without either a probable cause determination, or even notification to the account holders. Justice Powell, writing for the majority, stated:

> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Id.* at 443 (citing *United States v. White*, 401 U.S. 745 (1971); *Hoffa v. United States*, 385 U.S. 293 (1966); and *Lopez v. United States*, 373 U.S. 427 (1963)). This same conclusion was reached by the Maine Supreme Judicial Court under its State Constitution. *State v. Fredette*, 411 A.2d 65, 66-67 (Me. 1979).

Other States have refused to find reasonable expectations of privacy for telephone records absent statutory protections. After a lengthy explanation of criticisms of the Supreme Court's holdings in *Miller* and *Smith v. Maryland*, 442 U.S. 735 (1979), the Kansas Supreme Court stated, "There is no more expectation of privacy in bank and telephone records than there is, for example, in a confession to a minister or in conducting legal business with a lawyer, both of which have *statutes* guaranteeing privacy . . . ." *State v. Schultz*, 850 P.2d 818, 829-30 (Kan. 1993) (emphasis added); *see also People v. Di Raffaele*, 433 N.E.2d 513, 516 (N.Y. 1982) ("There is no merit to his arguments that the telephone toll-

billing records should have been suppressed. Defendant had no legitimate expectation of privacy in the records maintained by the telephone company with respect to either his own telephone or that of his friend . . . ."); *Yarbrough v. State*, 473 So. 2d 766, 767 (Fla. Dist. Ct. App. 1985) ("We find that the rationale expressed in *Smith* likewise delineates the parameters of the constitutional protection in Florida, and in accordance with *Smith* we conclude that . . . an individual does not have a legitimate expectation of privacy, which society would recognize as reasonable, with regard to numbers dialed into a commercial telephone system."); *State ex rel. Ohio Bell Tel. Co. v. Williams*, 407 N.E.2d 2, 3 (Ohio 1980) ("Furthermore, a pen register is not a wiretap, and any questions concerning violations of the judicially recognized expectations of privacy and violations of Fourth Amendment protections are not applicable to pen registers.").

The D.C. Circuit, in holding that individuals have no reasonable expectation of privacy in their telephone records, noted that business records are disclosed to third parties and are therefore not subject to protection:

> Every individual must from time to time reach beyond his private enclave, draw other people into his activities, and expose his activities to public view. In any normal life, even in pursuing his most private purposes, the individual must occasionally transact business with other people. When he does so, he leaves behind, as evidence of his activity, the records and recollections of others. He cannot expect that these activities are his private affair. To the extent an individual knowingly exposes his activities to third parties, he surrenders Fourth Amendment protections, and, if the Government is subsequently called upon to investigate his activities for possible violations of the law, it is free to seek out these third parties, to inspect their records, and to probe their recollections for evidence.

*Reporters Com. v. American Telephone & Telegraph*, 593 F.2d 1030, 1043 (D.C. Cir. 1978) (emphasis omitted), *cert. denied*, 440 U.S. 949 (1979).

The dissent rightly laments the assault on privacy from the unparalleled advances in business practices and technology over the two decades since *Valenzuela* was decided. That extraordinary progress, however, makes *Valenzuela* less and not more invasive. Regrettably, more and more of our personal details are cast about in the near-boundless reaches of cyberspace through ever-more sophisticated technology. Businesses buy and sell personal information in an effort to create expansive databases of current and potential customers. While technology's possibilities do not and should not control objectively reasonable expectations of privacy, it

would be imprudent to suggest that they will not affect, and in some cases shape, what expectations of privacy are objectively reasonable. In those contests between privacy and technology where the constitutional expectations of privacy may not reasonably survive, it is increasingly important for the legislature to weigh invasiveness against personal desires for privacy and to strike the proper balance. Creating the constitutional rule proposed by the dissent would lead to undesirable outcomes in future cases.

State and federal legislative bodies have already drawn these kinds of lines. At one time, this court refused to recognize physician-patient and psychologist-patient privileges as protected under our common law. *See State v. Davis*, 108 N.H. 45, 50 (1967). These protections were subsequently added by statute in 1969 and 1957, respectively. *See* RSA 329:26 (2004); RSA 330-A:19 (Supp. 1959) (current version at RSA 330-A:32 (2004)); *see also* N.H. R. Ev. 503(a), 503(b). But even given these statutory protections, this court has construed the physician-patient privilege quite strictly, refusing to apply it to emergency medical technicians because they do not work "under the supervision of a physician or surgeon" as required by the statute. *State v. LaRoche*, 122 N.H. 231, 233 (1982).

The legislature has also seen fit to pass rape-shield laws to protect the privacy of rape victims after this court had refused to do so. For over one hundred years, evidence of "the general character of the prosecutrix for chastity" was admissible in rape cases. *See State v. Forshner*, 43 N.H. 89, 89 (1861); *State v. Lemire*, 115 N.H. 526, 532 (1975). It has only been within the last thirty years that the legislature has prohibited evidence of "[p]rior consensual sexual activity between the victim and any person other than the actor" as well as "[t]he victim's manner of dress at the time of the sexual assault." RSA 632-A:6, II (1996), :6, III-a (Supp. 2004).

Additionally, in response to the Supreme Court's holding in *Miller*, Congress stepped in to protect individuals' financial information. It enacted the Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-3421 (2000), permitting individuals to contest governmental access to their financial records held by banks and other institutions.

While objectively reasonable expectations of privacy must be shielded from warrantless intrusions, I do not find such expectations in the case before us. I would, however, encourage the legislature to examine whether telephone billing records should be protected from the reach of a prosecutor's subpoena. For these reasons, I concur specially.

NADEAU and GALWAY, JJ., dissenting. We disagree with the conclusion of the lead opinion and the special concurrence that the defendant did not

have a reasonable expectation of privacy in the information concerning his cellular telephone calls compiled by U.S. Cellular in its ordinary course of business. The reality of today's technological society and common experience requires protection of this information from warrantless seizures.

In *State v. Goss*, 150 N.H. 46 (2003), for the first time, we adopted a reasonable expectation of privacy analysis under Part I, Article 19 of the New Hampshire Constitution. This analysis recognizes that the requirements of Part I, Article 19 exist to protect a person's legitimate expectation of privacy from unreasonable governmental intrusions. *See Katz v. United States*, 389 U.S. 347, 360-62 (1967) (Harlan, J., concurring). To determine the legitimacy of the defendant's privacy expectation, we examine first, whether the defendant had an actual, subjective expectation of privacy and second, whether this expectation is one that society is prepared to recognize as reasonable. *Goss*, 150 N.H. at 48-49.

In our view, when a person communicates information to the telephone company in order to use its services, that person has a reasonable expectation of privacy in the information conveyed. We believe that a cell phone subscriber has an actual expectation that the dialing of numbers from his cell phone will be free of government intrusion and that this expectation is one that society is prepared to recognize as reasonable. *See, e.g., People v. Sporleder*, 666 P.2d 135, 141-42 (Colo. 1983). Whether the information disclosed is recorded for billing purposes or consists of phone numbers dialed to make outgoing telephone calls, it is not unlike that contained in "[p]ersonal letters, bills, receipts, prescription bottles and similar items that are regularly disposed of in household trash," *Goss*, 150 N.H. at 49, information that we have previously found protected under Part I, Article 19 of our State Constitution. We would reconsider, therefore, our holding in *State v. Valenzuela*, 130 N.H. 175, 200 (1987), *cert. denied*, 485 U.S. 1008 (1988), in light of our holding and reasoning in *Goss*, and the advances in technology of the last eighteen years.

Our decision in *Valenzuela* rested upon what we believe is a faulty premise, that disclosure of certain facts to a telephone company for a limited business purpose is a voluntary disclosure of these facts for all purposes. "The telephone is a necessary ... component of modern life." *Valenzuela*, 130 N.H. at 200 (Batchelder, J., dissenting). "For all practical purposes an individual in America today has very little choice about whether the telephone company will have access to the numbers he dials and the frequency of times he dials them." *Com v. Beauford*, 475 A.2d 783, 789 (Pa. Super. 1984). To use the service, "the individual must accept that this information will be collected by the company for billing purposes." *Id.* It seems clear to us that:

> A telephone is ... a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society .... The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government.

*Sporleder*, 666 P.2d at 141. Moreover, a collection of the information subpoenaed by the State in this case can provide a virtual mosaic of a person's private life. *See Valenzuela*, 130 N.H. at 200 (Batchelder, J., dissenting).

We view the "disclosure to the telephone company of the number dialed as simply the unavoidable consequence of the subscriber's use of the telephone as a means of communication and the telephone company's method of determining the cost of the service utilized." *Sporleder*, 666 P.2d at 141. We find compelling the argument made by the Supreme Court of New Jersey in *State v. Hunt*, 450 A.2d 952, 956 (N.J. 1982):

> It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons. The ... billing record is a part of the privacy package.

The compulsory disclosure of certain facts to the telephone company for the purposes of using an instrument of private communication does not justify the assumption that the company will freely share that information with others, or that the State can seize it without probable cause. *See Valenzuela*, 130 N.H. at 200 (Batchelder, J., dissenting).

The lead opinion asserts that the defendant does not have a reasonable expectation of privacy in the billing records because they were never in his possession and contained only information that he voluntarily conveyed to U.S. Cellular in order to make use of its telephone service. Although the information the defendant provided was recorded for billing purposes and retained by U.S. Cellular in the ordinary course of its business, it seems to us that it is information "that few people would want to be made public." *Goss*, 150 N.H. at 49. A "telephone subscriber has a reasonable expectation that the calls he makes will be utilized only for the accounting functions of

the telephone company[;] he cannot anticipate that his personal life, as disclosed by the calls he makes and receives, will be disclosed to outsiders without legal process." *People v. Blair*, 602 P.2d 738, 746 (Cal. 1979). In our view, "[p]rivacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a . . . phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes." *Smith v. Maryland*, 442 U.S. 735, 749 (1979) (Marshall, J., dissenting).

Under the lead opinion's reasoning, a person who orders items, legal to possess, over the internet for delivery to someone else, has no expectation of privacy in the information required to make the purchase. During the eighteen years since *Valenzuela* was decided, gigantic strides in technology have made possible increased intrusion into our personal lives. Left unchecked by the protections the warrant requirement provides, these advances in technology could render meaningless the concept of privacy that society has come to expect and enjoy.

Justice Batchelder's statement in *Valenzuela* is even more relevant today than it was in 1987.

> Article 19 protects a person's "papers" from all unreasonable searches and seizures. "Papers" as tangible objects, however, have little or no intrinsic value. The value of "papers" rests in the content of the information contained in them. The mere advance in technology from paper as the medium for the flow of information to, for example, telephonic communications should not alter the protective force of article 19. Similarly, article 19 should not be limited to protections against the intrusive capabilities of the government at the time of the adoption of article 19. Rather, the areas of protected privacy must be examined and determined on a case by case basis in light of the technology available to the government at any given time. The protected rights, of necessity, become more sharply defined as science and technology broaden the scope of governmental power. In the end, I see no functional difference between government officials searching for and seizing a person's papers, in the course of an investigation without the benefit of a warrant based on probable cause, and their monitoring the communicative activities of a citizen without the burden of similar requirements.

*Valenzuela*, 130 N.H. at 201 (Batchelder, J., dissenting).

Because we consider *Valenzuela* to have been wrongly decided and its reasoning undermined by our decision in *Goss*, we believe that the lead opinion errs by adhering to it under principles of stare decisis. "While we

recognize the value of stability in legal rules, the doctrine of stare decisis is not one to be either rigidly applied or blindly followed. The stability of the law does not require the continuance of recognized error." *Matarese v. N.H. Mun. Assoc. Prop.-Liab. Ins. Trust*, 147 N.H. 396, 400 (2002) (quotation omitted). "Where a decision has proven unworkable or badly reasoned ... we will not hesitate to revisit it." *Providence Mut. Fire Ins. Co. v. Scanlon*, 138 N.H. 301, 304 (1994).

Furthermore, because of the technological advances of the last eighteen years, we believe the holding in *Valenzuela* is not of such a nature as to demand respect in a society governed by the rule of law. The consequences of overruling *Valenzuela*, therefore, would not create a "special hardship" which would weigh in favor of the retention of its holding. *Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 504-05 (2003) (quotation omitted). Nor will overruling its holding result in "a mere exercise of judicial will with arbitrary and unpredictable results." *Id.* at 504. Expanding the privacy rights of the citizens of New Hampshire would merely require the State to have a warrant supported by probable cause before obtaining this information, a standard that the State must routinely meet to gather other evidence.

Accordingly, we would overrule *Valenzuela* and hold that the defendant has a reasonable expectation of privacy in the billing records held by U.S. Cellular, and exclude them from evidence because they were seized by the State without a warrant. Because the State does not argue harmless error, we would reverse the defendant's conviction and remand for a new trial.

For these reasons, therefore, respectfully, we dissent.