Hampton District Court
No. 2005-884

RENEE FISHER

v.

MADALINE MINICHIELLO

Argued: January 11, 2007
Opinion Issued: April 12, 2007

*Forsley & Eggleston, P.A.*, of Hampton (*Lawrence S. Forsley* on the brief and orally), for the plaintiff.

*Patrick M. Carron*, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Madaline Minichiello, appeals a stalking final order, *see* RSA 633:3-a (Supp. 2006), issued against her by the Hampton District Court (*Frasier*, J.). We affirm.

The following facts were adduced at the district court hearing on the stalking petition. The plaintiff, Renee Fisher, is the administrator of The Partridge House Assisted Living in Hampton. The defendant's parents were residents there for approximately two years.

When her parents were admitted to The Partridge House, the defendant had a power of attorney for healthcare for each of them. Consequently, the staff of The Partridge House communicated with her concerning the care her parents were receiving. Fisher testified that it was "difficult to

communicate with [the defendant] for healthcare issues. She started to be very threatening to the staff, . . . and it started to interfere with the caregiving of her mother." Fisher said the defendant made "threatening phone calls" and that "she would keep the nurses on the phone for hours and hours at a time." In addition, the defendant complained to Fisher about the care of her parents. After Fisher investigated these complaints, the defendant accused her of lying. On several occasions when the defendant threatened staff, the police were called.

On July 5, 2005, Fisher sent the defendant a letter prohibiting her from accessing The Partridge House. The letter was precipitated by an incident in which the defendant "walked into the kitchen and was very loud and abusive towards the kitchen staff, waving her fists in the air, punching her finger directly in the kitchen staff's face, and threatening." In response to the letter, the defendant left Fisher a forty-five minute voice mail message stating "she planned to retaliate." On July 8, Fisher petitioned the district court for a protective order.

The defendant, however, returned to The Partridge House on July 10 with her attorney, his wife and his daughter, at which time she was discovered in her mother's room packing her mother's clothes. The police were called and the defendant fled.

Fisher also testified that sometime in 2005, she reported to the New Hampshire Division of Elderly Services "an allegation of physical abuse in the dining room of The Partridge House." The alleged perpetrator was the defendant and the victim was her mother. There was "a finding of abuse."

At some point, a new guardian was appointed for the defendant's mother. He sent the defendant a letter telling her she could no longer visit her mother. In October 2005, a week before the hearing on the stalking petition, the defendant's mother was moved from The Partridge House to another facility. Fisher testified that she nonetheless still fears for her personal safety because in various phone conversations the defendant "brings up things that have happened so many years ago that she still holds grudges and she still holds people accountable for things for years to come . . . ."

During the hearing on the stalking petition, the defendant also testified. She denied, sometimes at length, both ever yelling at or threatening the staff and telling Fisher she would retaliate against her.

After the hearing, the district court issued a protective order barring the defendant from being within "500 feet of [the] plaintiff or any of her property." The court's written order stated:

> In a close case the court finds plaintiff proved by a preponderance of the evidence that the conduct of the defendant

> well exceeded a concern for the care of her mother and entered an area of activity which threatened the well being of the plaintiff and was in its result a pattern of intimidation to plaintiff and her staff.

This appeal followed.

Here, the defendant raises two issues. First, she challenges the sufficiency of the evidence. Second, she argues that the trial court's decision contravenes RSA 633:3-a and RSA chapter 173-B and therefore is erroneous as a matter of law and public policy. We address each issue in turn.

On appeal, we review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law. *Fichtner v. Pittsley*, 146 N.H. 512, 515 (2001). We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony. *Id.* We view the evidence in the light most favorable to the plaintiff. *Cf. State v. Gubitosi*, 152 N.H. 673, 681 (2005).

The defendant's arguments on the sufficiency of the evidence are closely intertwined with questions of statutory interpretation. For example, the defendant contends that there was insufficient evidence that the defendant stalked the plaintiff because the text of the statute does not permit the court to consider, as evidence of stalking, events or conduct not directly involving the person seeking the stalking petition. The defendant also argues that there was insufficient evidence that the defendant engaged in a course of conduct as defined in RSA 633:3-a, II(a).

We begin our analysis by outlining the pertinent portions of the statutory scheme. Under RSA 633:3-a, III-a, a person who has been the victim of stalking may file a civil petition in either district or superior court seeking the relief available under RSA chapter 173-B, including a protective order. The person must prove "stalking" by a preponderance of the evidence. *Id.* The definition of stalking has three variants. *See* RSA 633:3-a, I(a), (b), (c). For purposes of this appeal, two variants arguably apply. Both subsections (a) and (b) require proof of a "course of conduct targeted at a specific" individual or person.

Course of conduct is defined in RSA 633:3-a, II(a) to include, but not be limited to, any of the following acts or a combination thereof:

> (1) Threatening the safety of the targeted person or an immediate family member.

> (2) Following, approaching, or confronting that person, or a member of that person's immediate family.

(3) Appearing in close proximity to, or entering the person's residence, place of employment, school, or other place where the person can be found, or the residence, place of employment or school of a member of that person's immediate family.

(4) Causing damage to the person's residence or property or that of a member of the person's immediate family.

(5) Placing an object on the person's property, either directly or through a third person, or that of an immediate family member.

(6) Causing injury to that person's pet, or to a pet belonging to a member of that person's immediate family.

(7) Any act of communication, as defined in RSA 644:4, II.

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Town of Hinsdale v. Town of Chesterfield*, 153 N.H. 70, 72 (2005). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Appeal of Town of Bethlehem*, 154 N.H. 314, 319 (2006). We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* We do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme. *Soraghan v. Mt. Cranmore Ski Resort*, 152 N.H. 399, 405 (2005). When interpreting two or more statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes. *Id.*

We first consider whether the language of RSA 633:3(a) and (b) requires the conduct at issue to directly involve the targeted person or individual. Since the district court found that the defendant engaged in a "pattern of intimidation," we agree with the defendant that it appears the court considered conduct that did not involve Fisher directly, such as that directed towards other staff members. Although it is unclear from the record exactly what other acts the court considered, we do not agree with the defendant that it was error for the district court to have looked to these acts in determining whether the statutory requirements were satisfied.

While the defendant correctly points out that there must be proof of a course of conduct targeted at a specific person or individual, the acts that constitute a course of conduct, as defined in section II, are not limited to acts against the targeted person directly. Subsection (a)(1), for example,

includes threats against the targeted person's "immediate family." Subsection (a)(6) includes injury to the targeted person's pet or a pet belonging to that person's immediate family. Indeed, subsection (a)(3) expressly includes the act of merely "appearing" at or in "close proximity to" the targeted person's place of employment. Moreover, the statute, through its use of the phrase "may include, but not be limited to," provides that the enumerated acts do not constitute an exhaustive list. When a statute sets forth a nonexhaustive list of acts, we have held that other acts which are similar may be considered. *Conservation Law Found. v. N.H. Wetlands Council*, 150 N.H. 1, 5-6 (2003). Thus, we conclude that threats directed at the targeted person's co-workers may be considered as acts constituting a course of conduct under section II.

This conclusion finds support in *State v. Gubitosi*. There, one of the acts alleged in the indictment was that the defendant attempted to telephone the victim after being told by the police not to contact her. *Gubitosi*, 152 N.H. at 681. The defendant argued that a telephone call during which he spoke to the victim's friend—not to the victim herself—was merely an attempt to telephone the victim and could not be considered part of the course of conduct. *Id.* at 682. We held that under RSA 633:3-a, II(a)(7), a course of conduct may include any act of communication as defined in RSA 644:4, II (Supp. 2004) and that that statute "does not require that the act of communication take place between the defendant and the intended victim." *Id.* We thus concluded that the act of telephoning the victim's friend could be considered one of the two acts required to prove a course of conduct. *Id.* at 682-83. Similarly, here we conclude that the district court correctly considered the acts against the other staff members in deciding whether the plaintiff met her burden.

■ The defendant's other sufficiency argument is that the plaintiff did not prove "2 or more acts." RSA 633:3-a, II(a) defines a course of conduct as involving "2 or more acts," and we acknowledge that the district court, in finding a "pattern of intimidation," did not specify the two acts that constituted the "pattern." However, the defendant appears to concede that her threat to retaliate constitutes one act for purposes of subsection (a). We agree that the threat falls within (a)(1). As to a second act, the defendant argues that there is insufficient evidence, especially since the court did not make a specific finding in this regard. We disagree. In the first part of this opinion we held that the acts the defendant perpetrated against the plaintiff's coworkers fall within the definition of course of conduct. Thus, any one of these several acts—all of which are within the definition of course of conduct—satisfies the statutory requirements.

However, the defendant's argument raises an important question: whether trial courts are required to make specific findings as to precisely which two acts constitute the course of conduct required by the statute. We have not yet had occasion to decide whether such a requirement exists under RSA 633:3-a.

RSA 633:3-a, III-a specifically provides, "The types of relief that may be granted, the procedures and burdens of proof to be applied in such proceedings, the methods of notice, service, and enforcement of such orders, and the penalties for violation thereof shall be the same as those set forth in RSA 173-B." Thus, RSA 633:3-a, III-a arguably mandates the applicability of our interpretation of RSA chapter 173-B to orders on civil stalking petitions.

In *Fillmore v. Fillmore*, 147 N.H. 283, 284 (2001), we vacated a protective order issued under RSA chapter 173-B. We stated: "Because RSA 173-B:1 contains an enumerated list of prohibited conduct, we read RSA 173-B:5 to require that a trial court must make a *specific* finding of criminal conduct in order to issue a final restraining order against a defendant." *Id.* at 285 (emphasis added). Our holding in *Fillmore* was based upon the statutory language of RSA 173-B:5 and thus became a procedural requirement for all protective orders issued under RSA chapter 173-B. This procedural requirement exists in addition to the requirement of RSA 173-B:3, I, that the facts alleged against the defendant be included within the petition for the protective order. We acknowledge that by operation of RSA 633:3-a, III-a, the requirements of RSA 173-B:3, I, would also be applicable to petitions for civil stalking orders. However, in order to be consistent with our interpretation of RSA 173-B:5 in *Fillmore*, we must conclude that RSA 633:3-a, II(a), which also contains an enumerated list of prohibited conduct, likewise requires specific findings of the course of conduct, which is defined as two or more acts. *See* RSA 633:3-a, II(a).

 Thus, in light of the reasoning articulated above, and in the interest of prospectively avoiding similar confusion concerning which acts were established to constitute the course of conduct, we take this opportunity to exercise our supervisory authority and provide instructions to trial courts in their issuance of *civil* stalking orders under RSA 633:3-a, III-a. *See* N.H. CONST. pt. II, art. 73-a. We hold that when issuing a stalking order in response to a *civil* petition filed pursuant to RSA 633:3-a, III-a, the trial court must make findings on the record that a defendant engaged in two or more specific acts "over a period of time, however short, which evidences a continuity of purpose." *See* RSA 633:3-a, II(a).

■ Aside from her sufficiency arguments, the defendant also contends that because RSA 633:3-a specifically references and incorporates RSA chapter 173-B, RSA 633:3-a is limited in scope by RSA chapter 173-B. In particular, the defendant argues that RSA 173-B:1, X limits who may file a stalking petition to those who meet the definition of "family or household member." In that vein, the defendant claims that "disruption of a place of business is not a matter for a stalking petition." The defendant's narrow interpretation of RSA 633:3-a is inconsistent with its plain language. RSA 633:3-a, III(a) allows "[a] person who has been the victim of stalking" to seek a protective order. The plain language of the statute does not limit the availability of a protective order or other relief to a family or household member. *See Soraghan,* 152 N.H. at 405; *Bethlehem,* 154 N.H. at 319.

Accordingly, for the foregoing reasons, we affirm the order of the district court.

*Affirmed.*

GALWAY and HICKS, JJ., concurred; DALIANIS, J., concurred specially; BRODERICK, C.J., dissented.

DALIANIS, J., concurring specially. I agree that given our deferential standard of review, the evidence was sufficient to support a finding under RSA 633:3-a (Supp. 2006). We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law. *Fichtner v. Pittsley,* 146 N.H. 512, 515 (2001). We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony. *Id.*

The record in this case supports the trial court's entry of a protective order under RSA 633:3-a, I. It includes evidence that the defendant engaged in a course of conduct, including telephone messages and threatening phone calls and statements directed towards the plaintiff. It also includes evidence that the plaintiff was afraid for her own safety and that her fear was reasonable.

Thus, I concur with the majority that the record supports the trial court's finding that the plaintiff was the "targeted individual" here. *See* RSA 633:3-a, I(a). I also concur with the majority that the "targeted individual" may be stalked through persons other than family members, such as employees, *see State v. Gubitosi,* 152 N.H. 673, 681-82 (2005). I write separately, however, because I believe that the defendant's conduct did not amount to stalking as it is commonly understood.

The record reveals that the defendant was disgruntled about the care given to her parents, especially her mother. She aggressively complained

about claimed staff abuses of her mother. There were angry exchanges between the defendant and the staff. She was an irate customer, demanding better services from a business. The trial court could have found that her conduct should have been curtailed, but I question whether a stalking petition was the proper vehicle for doing so, especially as other remedies were available.

In 1993, New Hampshire followed more than thirty other states in establishing the crime of stalking by enacting House Bill (HB) 476. HB 476 was entitled "An Act Establishing the Crime of Stalking and Authorizing the State to Enforce Domestic Violence Protective Orders Issued in Other States." Laws 1993, ch. 173. As this title suggests, and as their remarks during legislative hearings on the bill demonstrate, domestic violence was a chief concern of the bill's sponsors and supporters.

The bill's sponsor, Representative Donna Sytek, testified before the senate judiciary committee: "I had no idea ... that there is such a wide spread need in New Hampshire for legislation to allow the police to interfere before a domestic violence situation escalates into violence." SENATE COMM. ON JUDICIARY, HEARING ON HB 476 (April 12, 1993). Sandra Matheson, Director of the State Office of Victim and Witness Assistance of the Attorney General's Office, urged passage "on behalf of the Attorney General's Office and the many survivors of domestic violence murders." HOUSE COMM. ON CORRECTIONS AND CRIMINAL JUSTICE, HEARING ON HB 476 (Jan. 28, 1993).

Similarly, at the hearing in the house corrections and criminal justice committee, Representative Carl Johnson stated: "Harassing and threatening behaviors toward innocent people is a serious problem particularly for victims of domestic violence and sexual abuse." *Id.* At the same hearing, Senator Susan McLane noted that many women whose husbands or boyfriends murdered them, stalked them before doing so. *Id.* As Representative Peter Burling remarked, "Domestic violence is becoming a national sport. . . . Stalking is a part of this." *Id.* In addition, Governor Stephen Merrill, law enforcement officers, prosecutors and stalking victims testified about domestic violence and similarly threatening behavior. *Id.*; *see* SENATE COMM. ON JUDICIARY, HEARING ON HB 476 (April 12, 1993).

While the statute as written is not limited to domestic violence, the deliberations surrounding its passage were focused upon domestic violence and problems of like gravity, such as threatening strangers and obsessive former lovers. There is no indication in the legislative history that the intended purpose of the law was to protect businesses and their staff from overly aggressive consumers. Representative Sytek specifically noted that

"the legitimate activities of picketers, demonstrators, ... or even pesky reporters" do not amount to stalking. N.H.H.R. JOUR. 242 (1993).

I agree with Representative Sytek's remarks; there is a difference between a "pesky" individual and a stalker. Unfortunately, under the statute as written, a "pesky reporter" or a labor picketer, who goes too far, could be convicted just as the defendant was. As written, I believe that the statute blurs the line between an aggressive customer and a calculating stalker.

BRODERICK, C.J., dissenting. Either of the two statutory variants of stalking at issue in this appeal requires proof of "a course of conduct *targeted at a specific person.*" RSA 633:3-a, I(a) (emphasis added); *see also* RSA 633:3-a, I(b). Here, however, the trial court issued a stalking final order against Madaline Minichiello because her conduct "well exceeded a concern for the care of her mother and entered an area of activity which threatened the well being of the plaintiff and was in its result a pattern of intimidation *to plaintiff and her staff.*" (Emphasis added.)

A pattern of intimidation to the plaintiff and her staff is not the same thing as a course of conduct targeted at the plaintiff, which is what the stalking statute requires. To be sure, the statute enumerates six acts which may be part of a course of conduct when directed toward "the targeted person or an immediate family member." RSA 633:3-a, II(a)(1); *see also* RSA 633:3-a, II(a)(2)-(6). But given the statutory requirement of a course of conduct targeted at a specific person, threatening, following, approaching or confronting an immediate family member is only part of a course of conduct for purposes of the stalking statute when the intent behind interacting with an immediate family member is to threaten the targeted person. Furthermore, the statute does contemplate a situation in which interactions involving a targeted person's co-workers could count as part of a course of conduct, such as when a stalker communicates a threat against a targeted person through a targeted person's co-worker or enters a targeted person's place of employment for the purpose of threatening the targeted person, *see* RSA 633:3-a, II(a)(3). But as with interactions involving an immediate family member, an interaction involving a co-worker would only count as part of a course of conduct if it took place as a result of the stalker's attempt to threaten the targeted person. To the extent the majority opinion seems to expand the legislature's list of "all-purpose" surrogates to include co-workers, I disagree.

As defined by the legislature, stalking is an offense directed against individuals, not groups of individuals or institutions. While I do not doubt that the defendant's conduct entitled Partridge House and its staff—and perhaps Renee Fisher individually—to legal protection, I do not believe

that Minichiello engaged in the kind of conduct the legislature enacted the stalking statute to prevent. Accordingly, I respectfully dissent.