Nashua District Court
No. 2006-684

JENNIFER COMER

v.

PATRICK SEAN TRACEY

Argued: June 20, 2007
Opinion Issued: September 25, 2007

Jennifer Comer, *pro se*, filed no brief.

*Bernstein Shur*, of Manchester (*Dawnangela Minton* on the brief and orally), for the respondent.

*Kelly A. Ayotte*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State, as *amicus curiae*.

BRODERICK, C.J. The respondent, Patrick Sean Tracey, appeals a final stalking order, *see* RSA 633:3-a (2007), issued against him by the Nashua District Court (*Leary*, J.). We reverse.

I

The record supports the following. Until March 12, 2006, Tracey was engaged to the petitioner, Jennifer Comer, and lived with her in her home. On March 12, Comer asked Tracey to move out, which he did, and over the next week or so, Comer broke off the engagement. For several weeks after that, Comer delivered clothing and other belongings to Tracey. On April 15, Tracey removed the last of his belongings from Comer's residence. After they broke up, Comer and Tracey had various unresolved financial issues concerning money each believed he or she was owed by the other, and concerning the disposition of the engagement ring. In addition, Tracey believed that Comer had never adequately explained her reasons for breaking up with him. While Tracey was attempting to elicit a satisfactory explanation from Comer, she in turn was telling him that she wished to have no further contact with him.

On June 3, Tracey telephoned Comer and asked to meet with her. She said she did not want to see him or talk to him and ended the conversation by telling him she had to go to a hair appointment. When Comer was finished at the hair salon, she found Tracey waiting for her in the parking lot. She told him she was not comfortable talking with him, and then drove away. Later that day, Tracey left Comer two telephone messages, which Comer played for a police officer but which are not part of the record before us, and which appear not to have been part of the record before the

trial court. Regarding the content of those messages, Comer testified that Tracey told her he was not a stalker and Tracey testified as follows:

> The context of both voicemails were basically Jennifer, I probably didn't articulate things very well when I went up there, something to that effect. And I believe I said—I was just looking for some answers as to why things ended the way they did and why she treated me the way she did and I was—believe one of the terms I used was that I was looking for some compassion as to getting those answers.

Notwithstanding that evidence in the record, the trial court made no factual findings concerning the content of the June 3 telephone calls. After June 3, Tracey had no further contact with Comer.

During the parking-lot encounter on June 3, Comer saw that Tracey was driving a new car, and that the car had New Hampshire license plates. Because she believed Tracey was still living in Massachusetts, she contacted the registry of motor vehicles on June 5 and learned that he had registered the car using the address of her residence, *i.e.*, the home they had lived in together until the break-up. On that same day, she discovered a pile of cigarette butts under the seat of her car. The cigarettes she found were the same brand Tracey smoked. Also on June 5, Comer filed a stalking petition against Tracey, which was served on June 9. The narrative portion of the petition stated, in its entirety:

> I have repeatedly asked Mr. Tracey to stop contacting me in any manner [and] he has not. On June 3, 2006, he called from an unknown number to me [and] I answered. I again told him I did not want to see him or talk to him. He then showed up at my hair salon [and] waited for me. He then called me 2 more times. The week of May 31, Patrick Tracey registered his new car in Hollis at my address which he has not lived at since 3/12/06. I believe that he has entered my house while I was not at home. He has exhibited violent behavior in the past and I am afraid. He has ignored all of my requests to not contact me and his demeanor goes from friendly to angry very quickly.

The trial court issued a stalking temporary order and, after a hearing, issued a stalking final order, based upon the following findings and rulings:

> The parties were engaged to be married and had been residing together at the plaintiff's residence in Hollis, NH. The plaintiff broke off the engagement in March of 2006 and the defendant removed his possessions from the Hollis residence on or about

April 15, 2006. After he removed his possessions the plaintiff made it clear to the defendant that she wished to terminate all contact. The defendant continued to telephone and e-mail her on multiple occasions.

On June 3, 2006, contrary to her expressed wishes, the defendant appeared in the parking lot outside of the plaintiff's hair stylist, knowing she had an appointment, and made contact with her. He made further contact with her by telephone later that day. The court further finds, more probably than not, that he placed cigarette butts in her car on June 3rd and, subsequent to his removing his personal items from the residence, entered her residence without her permission.

Considering the totality of the circumstances, the court finds that the defendant engaged in a course of conduct targeted at the plaintiff which would cause a reasonable person to fear for her safety and, having observed the plaintiff during the course of the hearing, further finds that the plaintiff was actually placed in such fear.

Based upon the foregoing, the trial court appears to have found that the respondent engaged in a course of conduct consisting of: (1) the June 3 parking-lot encounter; (2) the two subsequent telephone calls; (3) placing cigarette butts in the petitioner's automobile; and (4) entering the petitioner's residence. While the trial court noted that "[t]he defendant continued to telephone and e-mail [the petitioner] on multiple occasions," which could be construed as referring to contact between April 15 and June 3, the factual allegations concerning any such activities in the stalking petition fall short of the statutory pleading standard, see RSA 633:3-a, III-a; RSA 173-B:3, I (2002), and, as a result, that conduct was never properly a part of the petition or this case.

The respondent moved for reconsideration, arguing that: (1) contrary to the trial court's finding, Comer's petition never alleged that he lacked permission to enter her residence, and the evidence was insufficient to support a finding that he had ever entered the residence after he removed the last of his belongings; (2) the trial court erred by considering the cigarette-butt deposit because it was not mentioned in Comer's petition; and (3) because the June 3 parking-lot encounter and his subsequent telephone calls were constitutionally protected activities, the trial court erred in including them in a course of conduct for purposes of RSA 633:3-a, I(a). In its order denying the motion to reconsider, the trial court did not mention any telephone calls or e-mails preceding the parking-lot encounter or the telephone calls that followed it.

The trial court did say that "in the [findings and rulings supporting the stalking final] order the court determined, more probably than not, the defendant entered the plaintiff's residence without her permission and that he appeared in the parking lot of her hair stylist knowing she had an appointment and had no legitimate reason to be there." The trial court then went on to reject the respondent's argument that the parking-lot encounter was a constitutionally protected activity. However, while the trial court did address the respondent's argument that the parking-lot encounter was constitutionally protected, it neither mentioned the two telephone calls the respondent made to the petitioner after the parking-lot encounter nor addressed the respondent's argument that those telephone calls were also constitutionally protected activity. Regarding the cigarette butts, the trial court explained:

> The court also found that the defendant left cigarette butts in the plaintiff's car while she was in the hair salon. The defendant argues that the plaintiff failed to plead this allegation in her petition and therefore this event, as found by the court, is irrelevant and cannot be used in determining a course of conduct. First, while it was not specifically pled it is related to the parking lot incident that was alleged. Second, if this is a separate event it constitutes a third act. Since the statute requires two (2) acts this further finding is unnecessary for the plaintiff to meet her burden of proof.

Thus, notwithstanding the trial court's mention of "telephone [calls] and e-mail . . . on multiple occasions," and the two June 3 telephone calls in the findings and rulings supporting its stalking final order, the order denying the respondent's motion for reconsideration could reasonably be read as clarifying the stalking final order by specifying that it was based upon a course of conduct that included only the respondent's entry into the petitioner's residence, the parking-lot encounter and the cigarette-butt deposit. This appeal followed.

On appeal, the respondent argues that the trial court: (1) erroneously relied upon constitutionally protected activity; *i.e.*, the parking-lot encounter and the subsequent two telephone calls as a basis for issuing its stalking final order; (2) erroneously relied upon facts and allegations not included in the stalking petition; *i.e.*, the petitioner's allegations regarding the cigarette-butt deposit; and (3) had insufficient evidence to support its findings that the respondent entered the petitioner's residence after April 15 and that the respondent's conduct would cause a reasonable person to fear for her safety. The petitioner has filed no brief, and the State, as *amicus curiae*, addresses only the respondent's constitutional argument.

## II

■ We begin by determining whether the trial court erred by considering the cigarette-butt deposit. The statute governing the issuance of stalking orders provides that when a person who claims to be a stalking victim "seek[s] relief by filing a civil petition in the district court . . . the methods of notice, service, and enforcement of such orders, and the penalties for violation thereof shall be the same as those set forth in RSA 173-B." RSA 633:3-a, III-a. Among other things, RSA chapter 173-B provides that "[n]otice . . . of the facts alleged against the defendant shall be given to the defendant," RSA 173-B:3, and that "[t]he plaintiff shall be permitted to supplement or amend the petition only if the defendant is provided an opportunity prior to the hearing to respond to the supplemental or amended petition," *id.* Here, the cigarette-butt deposit was not mentioned in the stalking petition, and the petitioner did not move to amend the petition to include that factual allegation. Because the petition included no allegations concerning the cigarette-butt deposit, and the petition was not amended prior to the hearing to include any such allegations, the trial court erred as a matter of law by considering the cigarette-butt deposit. *See In the Matter of Aldrich & Gauthier*, 156 N.H. 33, 34-35 (2007).

## III

Next we turn to the respondent's argument that the trial court's finding that he had entered the petitioner's residence was based upon insufficient evidence. We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidential support or tainted by error of law. *Fisher v. Minichiello*, 155 N.H. 188, 190 (2007). We accord considerable weight to the trial court's judgments on the credibility of witnesses and the weight to be given testimony. *Id.* We view the evidence in the light most favorable to the petitioner. *Id.*

At the hearing, the evidence concerning the respondent's alleged entry into the petitioner's residence consisted of the following:

> MS. COMER: I just, you know, I live alone and I want to feel safe. Oh, actually there was, after June 3, on June 5, when I found out that he had—the same day that I found he registered the car to my [home], I also found a pile of cigarettes in my car and I did not lock my car when I was at the hair appointment. But it was his brand of cigarette butts and there was a whole pile of them underneath my seat. And I knew they hadn't been there before because I had my car serviced by Volvo on the Thursday

prior to that June 3—whatever that makes that. And they had—they vacuum it out and they wash it for you, so it definitely wasn't there. And when I went in the car there was a whole—I kept wondering why it was smelling so bad and there was a whole pile of his cigarettes there. And the other thing that after speaking with—

THE COURT: The cigarettes. Had they been smoked already?

MS. COMER: The butts. Yes.

THE COURT: And the ashes as well?

MS. COMER: Just the cigarette butts. And also, there have been a few things which up until that point and time, I just chalked up from me being forgetful or something. But there were things in the house that had been moved and—and certain things not in place the way that they should be and I kind of chalked it up to that, but in fact, you know, after that point, I started thinking possibly he'd been coming into the house and after Officer Bonan saying he's been in town and finding out that he was, in fact, in town several times, I was concerned that he was going in the house.

While the petitioner's testimony may be sufficient to support a finding that she suspected that the respondent might have entered her residence, or that she harbored concerns that he may have done so, the evidence before the trial court was not sufficient to support a finding that the respondent actually did enter the petitioner's residence. Moreover, while we defer to the trial court's credibility judgments, *id.*, that deference extends only to the trial court's determinations regarding whether or not to credit a witness's testimony upon a factual matter; we are not obligated to defer to the trial court's decision to adopt a particular party's beliefs or inferences from the factual record.

 Here, the record contains no eyewitness accounts or other direct evidence that the respondent entered the petitioner's residence after he removed the last of his belongings. The circumstantial evidence—second-hand reports of the respondent's presence in town "several times" and the petitioner's belief that objects in her residence had been moved—is notably weak. There was no evidence regarding what objects were out of place or the locations from which and to which they had been moved. There was no evidence concerning precisely when, over the course of approximately six weeks, the respondent was in town or when the petitioner noticed that objects in her residence were not in their proper places. There was no evidence that the respondent retained a key to the petitioner's residence after he removed the last of his belongings, and no

evidence even tending to eliminate the possibility that objects could have been moved by people other than the respondent who had been invited into the residence or had access to it. In short, the evidence before the trial court—second-hand reports of the respondent's presence in town and unidentified objects out of place in the petitioner's residence at unidentified times over a six-week span—was insufficient, as a matter of law, to support a finding that the respondent entered the petitioner's residence after his last visit in mid-April. Accordingly, even under the deferential standard we must apply, *id.*, we cannot uphold the trial court's finding that the respondent entered the petitioner's residence between mid-April and early June.

## IV

In its order denying the respondent's motion for reconsideration, the trial court specifically identified three acts by the respondent that justified its issuance of the stalking final order against him: (1) the cigarette-butt deposit; (2) the respondent's entry into the petitioner's residence; and (3) the parking-lot encounter. Because the trial court could not lawfully consider the cigarette-butt deposit, and because its finding concerning the respondent's entry into the petitioner's residence was not sufficiently supported by the evidence, neither of those acts may be used to support the lawfulness of the stalking final order. Thus, if the trial court had ruled that the stalking final order was justified *only* by the cigarette-butt deposit, the respondent's entry into the petitioner's residence and the parking-lot encounter—which it may in fact have done—then we would reverse and instruct the trial court to vacate the stalking final order and dismiss the petition. *See* RSA 633:3-a, II(a) (defining "course of conduct" as "2 or more acts over a period of time").

However, because the stalking final order may reasonably be read as identifying a course of conduct that included the parking-lot encounter and the two subsequent telephone calls, we must decide whether those three incidents would support the issuance of a stalking order against the respondent. Relief such as that sought by the petitioner in this case is available to "[a] person who has been the victim of stalking as defined in [RSA 633:3-a]." RSA 633:3-a, III-a. The offense of stalking is committed by a person who, among other things, "[p]urposely, knowingly, or recklessly engages in a course of conduct targeted at a specific person which would cause a reasonable person to fear for his or her personal safety . . . and the person is actually placed in such fear." RSA 633:3-a, I(a). In turn:

(a) "Course of conduct" means 2 or more acts over a period of time, however short, which evidences a continuity of purpose. A course of conduct shall not include constitutionally protected activity, nor shall it include conduct that was necessary to accomplish a legitimate purpose independent of making contact with the targeted person. A course of conduct may include, but not be limited to, any of the following acts or combination thereof:

. . . .

(2) Following, approaching, or confronting that person . . . .

. . . .

(7) Any act of communication, as defined in RSA 644:4, II.

RSA 633:3-a, II. RSA 644:4, II (2007), in turns, defines "communicates" to mean, among other things, "to impart a message by any method of transmission, including but not limited to telephoning . . . or electronic transmission."

 Here, the parking-lot encounter and the two subsequent telephone calls were not sufficient to support the issuance of a stalking order. Even if we assume that the parking-lot encounter constituted one of the required "2 or more acts" under RSA 633:3-a, I(a), the two subsequent telephone calls do not, as a matter of law, rise to the level of conduct sufficient to support the issuance of a stalking order. As we have noted, the trial court made no factual findings concerning the content of those calls. From the standpoint of the petitioner, the most favorable finding the trial court could have made would have been to accept her testimony, which was limited to stating that she played the telephone messages for a police officer who did not testify, and that in one or both of the calls, the respondent told her that he was not a stalker. She did not testify that the respondent's message was limited to denying that he was a stalker, nor did she indicate what else the respondent said. In addition she did not testify that his actions placed her in fear. Based upon the evidence before it, the trial court erred to the extent it determined that a reasonable person would have been placed in fear for his or her personal safety by the parking-lot encounter and the subsequent telephone calls.

We do not doubt the seriousness of the threat posed by stalkers, and we reject the respondent's argument that the unconstitutionality of RSA 644:4, I(a), see State v. Brobst, 151 N.H. 420, 425 (2004), and RSA 644:4, I(f), see State v. Pierce, 152 N.H. 790, 793 (2005), has any effect upon the reference to RSA 644:4, II in RSA 633:3-a, II(a)(7). Rather, we simply hold

that in this case, the evidence before the trial court did not warrant the issuance of a stalking final order. Accordingly, we reverse.

*Reversed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.