Jaffrey-Peterborough District Court
No. 2009-399

### IN RE ALEX C.

Argued: April 22, 2010
Opinion Issued: November 30, 2010

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Pamela E. Phelan*, assistant appellate defender, of Concord, on the brief and orally, for the juvenile.

BRODERICK, C.J. The juvenile, Alex C., appeals the ruling of the Trial Court (*Runyon*, J.) finding the delinquency petition true, *see* RSA 169-B:6, :16 (Supp. 2009). We affirm.

The following facts are undisputed. On the evening of February 27, 2009, Rachel K.'s daughter ran away from home. The next day, in an effort to locate her daughter, Rachel K. called friends and contacted the police. Using her daughter's password on her home computer, Rachel K. also logged in to her daughter's AOL Instant Message (AIM) account. Using her daughter's screen name of "hey Nicci hey," Rachel K. indicated that her daughter was available to communicate with her friends. She believed that one of her daughter's friends might respond with information that would help locate her daughter.

At approximately 10:30 a.m., the juvenile, using the screen name "skaterboy," sent an instant message to "hey Nicci hey." Rachel K. responded with a single instant message of "Hey"; the instant message exchange then ended without incident.

At approximately 11:00 a.m., the juvenile, now using the screen name "the kaboomroom95" again contacted "hey Nicci hey." He initially believed that he was communicating with Rachel K.'s daughter. After "hey Nicci hey" inquired who he was, the juvenile realized that Rachel K. was using her daughter's screen name and the following instant messages were sent:

> thekaboomroom95 (11:19:26 AM): ha this aint even [Rachel K.'s daughter]
>
> the kaboomroom95 (11:20:28 AM): f***ing idiots idk if this is her mom or not but get the f*** off her aim you stupid f***ing b****
>
> hey Nicci hey (11:27:01 AM): nice language young man — have the logs so we and the police are all set — thanks Alex and
>
> thekaboomroom95 (11:28:10 AM): well for one fat ass learn to spell for 2 i dident say where she is u f***ing dumbasss i said if ur there i was gonna tell her to get the f*** out because the cops will be

there you just get dumber and dumber go roll down a hill or something and squish a[ ]couple of kids u fat whale.

After this last instant message, a forty-six minute break occurred, during which neither Rachel K. nor the juvenile typed an instant message or logged off from their AIM accounts.

Beginning at 12:14:59 p.m. and ending at 12:15:36 p.m. — a period of thirty-seven seconds — the juvenile typed the phrase "fats***" and sent it to "hey Nicci hey" seventeen separate times. As the juvenile hit the "return" key in between typing each phrase on his computer keyboard, the phrase appeared as seventeen separate entries in the instant messaging window on Rachel K.'s home computer. Less than a minute later, at 12:16:00 p.m., the juvenile typed the phrase "stuppppid c***" and sent it to "hey Nicci hey." For approximately four minutes more, until 12:20:23 p.m., the juvenile sent an additional twenty-one instant messages; Rachel K. responded with seven instant messages of her own. At 12:20:23 p.m., the juvenile sent a final instant message of "peace faggot" to "hey Nicci hey" before logging off from his AIM account at 12:23:00 p.m.

Alleging that the juvenile had committed the offense of harassment, *see* RSA 644:4, I(b) (2007), the delinquency petition stated:

W[i]th the purpose to annoy Rachel [K.] [the juvenile] made repeated communications to her house in offensively coarse language, to wit, he made communications to her residence twenty times between 11:20 AM and 12:16 PM using coarse language.

At the close of the adjudicatory hearing, the juvenile moved to dismiss the petition, arguing that the instant messaging "conversation between him and [Rachel K.]" constituted "one communication," and, therefore, his conduct did not fall within the harassment statute's proscription against "repeated communications." After hearing arguments and reviewing the parties' memoranda of law, the trial court issued a written order ruling that all of the elements of the harassment charge had been proved beyond a reasonable doubt, and finding the petition true. This appeal followed.

On appeal, the juvenile contends that the trial court erred in finding that his conduct constituted "repeated communications" within the meaning of RSA 644:4, I(b). Specifically, he argues that a "plain reading" of RSA 644:4, I(b) "indicates that the statute prohibits a pattern of separate instant message *conversations*, not multiple comments made within a single AIM *conversation*. The State's reading of the statute to the contrary leads to an absurd and unjust result that is not supported by the legislative intent and the cases narrowly construing the statute." (Emphasis added.)

Here, the trial court construed RSA 644:4, I(b), a question of law; consequently, we review its ruling *de novo*. *See State v. Brown*, 155 N.H. 590, 591 (2007).

> In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. We first examine the language of the statute, and, where possible, we apply the plain and ordinary meanings to the words used. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Moreover, we do not consider the words and phrases in isolation, but rather within the context of the statute as a whole.

*State v. Gubitosi*, 157 N.H. 720, 723-24 (2008) (citations omitted). If a statute is ambiguous, we will consider legislative history to aid our analysis. *State v. Dansereau*, 157 N.H. 596, 598 (2008). We construe provisions of the Criminal Code "according to the fair import of their terms and to promote justice." RSA 625:3 (2007).

RSA 644:4, I(b) provides:

> A person is guilty of a misdemeanor, and subject to prosecution in the jurisdiction where the communication originated or was received, if such person . . . [m]akes repeated communications at extremely inconvenient hours or in offensively coarse language with a purpose to annoy or alarm another . . . .

The juvenile acknowledges that the pertinent language in his instant messages to Rachel K. was "profane." He does not contest that it was "offensively coarse," and he has not argued that he had any purpose other than to annoy Rachel K. Consequently, the sole question on appeal is whether the juvenile's twenty instant messages, sent to Rachel K. between 11:20 a.m. and 12:16 p.m. in offensively coarse language with the purpose to annoy her, were "repeated communications" under RSA 644:4, I(b).

In order to provide a context for our statutory analysis, we first consider the nature of an instant message and how "instant messaging" works. Our review illustrates that courts have used a variety of terms to describe this relatively recent development in electronic communications technology; those descriptions may or may not differentiate between an instant message and the process of instant messaging. For example:

> One cannot get a clear picture . . . without an understanding of internet chat rooms and instant messaging, two relatively recent

forms of electronic communication. . . . [A]n internet chat room . . . is not a place, *per se*, but, [is] instead a method for anyone with a computer and a connection to the internet to converse — instantly — with others similarly equipped about a common interest. Chat room conversations appear as text on a computer screen, with the participants' screen names followed by the text of their conversations. . . . Chat rooms often have moderators and can thus be monitored; in addition, chat rooms are designed to facilitate conversations among large groups of people . . . . For these reasons, once the electronic chats between two "chatters" turn to specific content where privacy . . . becomes a concern, they then turn to an instant messaging service — a two-way instantaneous text communication similar to a chat room — but with no one to monitor.

*Maxwell v. State*, 895 A.2d 327, 328-29 n.1 (Md. Ct. Spec. App. 2006) (quotations omitted).

■ An "instant message" is a private "one-on-one correspondence" that is not visible to the other occupants of the chat room.

*People v. Jensen*, 7 Cal. Rptr. 3d 609, 612 n.1 (Ct. App. 2003).

Instant messaging is a form of e-mail, but unlike e-mail, instant messaging allows users to immediately send and receive messages in "real time."

*Kerber v. Dairy Queen Operators Assn.*, No. C9-02-1883, 2003 WL 21694395, at *1 n.1 (Minn. Ct. App. July 22, 2003). For our own part, we have indicated that instant messaging is an application providing for online conversation between individuals by way of their computers and the internet. Individuals may participate in the instant messaging conversation by transmitting and receiving discrete, self-contained instant messages. Specifically:

Instant messaging is a form of computer communication in which individuals hold an online conversation via the internet. When a person sends an instant message to another person online, that message is transmitted instantaneously to the recipient, opening a chat window that allows both parties to see the message and to respond immediately. The chat window, while open, contains a complete history of all messages sent and received during the online conversation.

*State v. Lott*, 152 N.H. 436, 437 (2005) (quotation and brackets omitted).

■ RSA 644:4 does not define either the term "repeated" or the phrase "repeated communications," as used in RSA 644:4, I(b). The plain and ordinary meanings of "repeated" include "renewed or recurring again and again: CONSTANT, FREQUENT . . . said, done, or presented again . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1924 (unabridged ed. 2002). RSA 644:4, II (2007) does, however, define the term "communicates" for the purposes of RSA 644:4, I. Specifically:

> As used in paragraph I, "communicates" means *to impart a message by any method of transmission, including* but not limited to telephoning or personally delivering or *sending or having delivered any information* or material *by* written or printed note or letter, package, mail, courier service or *electronic transmission, including electronic transmissions generated or communicated via a computer.* For purposes of this section, "computer" means a programmable, electronic device capable of accepting and processing data.

(Emphases added.) The juvenile does not dispute that he communicated with Rachel K. by way of a computer.

■■ Consequently, we believe it reasonable to say that the plain and ordinary meaning of "repeated communications," within the overall context of RSA 644:4, is the renewed, frequent, or constant imparting of a message by any method of transmission. *See also* WEBSTER'S, *supra* at 460 (definition of "communication" includes "the act or action of imparting or transmitting"). Here, over the course of fifty-six minutes, from 11:20 a.m. to 12:16 p.m., the juvenile composed twenty separate instant messages and, using the keyboard of his computer, typed them into his instant messaging application. After typing an instant message, he sent it from his computer to that of Rachel K., where the message he had just imparted was available for her to read. The juvenile repeated this action twenty times. We fail to see how the juvenile's repeated instant message communications do not fit squarely within the actions proscribed by the plain language of the statute.

In contending that RSA 644:4, I(b) "prohibits the act of initiating successive communications[, but] does not concern itself with each statement made during a single communication," the juvenile argues:

> The instantaneous and real-time nature of an instant message conversation resembles the rhythm and experience of a telephone conversation. One instant message conversation, like a telephone conversation, necessarily involves numerous exchanges back and forth between the participants.

While we might agree with the juvenile's premise concerning successive and single communications, we disagree that a single conversation necessarily equates to a single communication, or even that an instant message conversation is particularly like a telephone conversation.

■ Instead, we view instant messaging as the direct technological progeny of e-mailing. As such, we consider the process of instant messaging, not necessarily as some monolithic entity — a single conversation, but as a series of discrete electronic messages between two or more individuals. As in the case of e-mail, the sender composes each instant message on a computer keyboard; the sender physically triggers each instant message to be sent by one computer and received by another via the internet; and the recipient may then read each instant message on a computer screen. While sending an instant message may invite a response, and may even initiate an instant messaging conversation, it does not necessarily have to do so. In that sense, we believe that an instant message is similar, not to a telephone conversation, but to a telephone call that reaches an answering machine instead of the ear of the telephone call's intended recipient. In both cases, a message has been imparted. *Cf. Lott*, 152 N.H. at 441 (explaining that, like an e-mail message and a message left on an answering machine, the recording of the instant message is necessary for the intended recipient of that message to read it; further, the sending of an e-mail or chat-room communication is analogous to leaving a message on an answering machine).

■ Further, we believe that an instant messaging conversation and a telephone conversation differ significantly. In a telephone conversation, two (or more) individuals can simultaneously speak directly with, and listen to, each other. Such conversation entails the near instantaneous imparting and receiving of oral messages; parties often speak simultaneously, with one person talking over or cutting off the other's speech in mid-sentence. Unlike an instant messaging conversation, a telephone conversation's substance is not composed, physically typed on a computer keyboard, electronically sent to another computer, and made available for another person to read, comprehend, and possibly respond. Indeed, the particular facts of this case serve to further underscore the differences. While a fifty-six minute telephone call between two people might not be uncommon, we think that a forty-six minute break during that call strains the meaning of "conversation."

To the extent that the juvenile argues that our plain meaning analysis of the statute is not supported by our decision in *Gubitosi*, we disagree. *Gubitosi* involved the appeal of a defendant's conviction for harassment under RSA 644:4, I(b) after he made repeated telephone calls to the victim,

at varying times of day, including late at night, often leaving messages that the victim considered progressively more harassing and frightening. *Gubitosi*, 157 N.H. at 722. The defendant unsuccessfully challenged RSA 644:4, I(b) as unconstitutionally overbroad. We held that the scope of the statute was narrowly tailored to the illegal communications sought to be prevented. *Gubitosi*, 157 N.H. at 728.

■ In distinguishing RSA 644:4, I(b) from subsections I(a) and I(f) that we had earlier found unconstitutional in *State v. Brobst*, 151 N.H. 420, 424 (2004), and *State v. Pierce*, 152 N.H. 790, 793 (2005), we stated:

RSA 644:4, I(b) does not apply to any call made to anyone, anywhere, at any time, whether or not conversation ensues. Under subsection (b), it is not just one [telephone] call that constitutes the offense, but a repeated course of calls. Further, subsection (b) specifically requires communications that consist of offensively coarse language or extremely inconvenient hours.

*Gubitosi*, 157 N.H. at 728 (citation and quotations omitted). There was no issue in *Gubitosi* of the defendant being prosecuted under RSA 644:4, I(b) for making multiple statements ("repeated communications") within a single telephone call or telephone message, and we see no conflict between our construction of the statute here and our decision in *Gubitosi*.

■ ■ Indirectly arguing that the meaning of RSA 644:4, I(b) is ambiguous, the juvenile cites certain legislative history of the harassment statute and invokes the rule of lenity as requiring a construction of the statute favorable to him.

We have previously noted that:

[T]he rule of lenity serves as a guide for interpreting criminal statutes where the legislature failed to articulate its intent unambiguously. This rule of statutory construction generally holds that ambiguity in a criminal statute should be resolved against an interpretation which would increase the penalties or punishments imposed on a defendant.

*Dansereau*, 157 N.H. at 602 (citation and quotations omitted). As noted earlier, we will consider legislative history to aid our statutory analysis if a statute is ambiguous. *Id.* at 598. In this case, however, we find no ambiguity in the statute. Instead, we have found it reasonable that the plain and ordinary meaning of "repeated communications," within the overall context of RSA 644:4, is the renewed, frequent, or constant imparting of a message by any method of transmission. Consequently, the rule of lenity is

inapplicable in this case and we need not review the statute's legislative history. *Cf. id.* at 603 (rule of lenity applied, and ambiguity resolved in favor of defendant, where neither the statute's language nor legislative history clearly established what the legislature intended by statutory phrase).

Even if we were to consider the statute's legislative history, however, we would not agree with the juvenile's argument that it indicates RSA 644:4, I(b) was designed to reach only "conduct amounting to a 'repeated course of calls,' " and not his conduct.

The juvenile first looks to the Model Penal Code. We have recognized that our Criminal Code is largely derived from the Model Penal Code; we have, therefore, looked to the Model Penal Code and its Commentaries when interpreting analogous New Hampshire statutes. *State v. Lamy*, 158 N.H. 511, 515 (2009). RSA 644:4, I(b) is substantially similar to section 250.4(3) of the Model Penal Code. *See* MODEL PENAL CODE § 250.4(3), at 360 (Official Draft and Revised Comments 1980). The juvenile cites Comment 2 as providing that section 250.4(3) was intended to address only a "pattern of harassment." Comment 2 makes clear that although the "principal application" of § 250.4(3) is telephone calls, the section is not limited to the same. *Id.* cmt. 2, at 360. Comment 2 is dated nearly two decades before the New Hampshire legislature amended RSA 644:4 to include a separate proscription against harassment by computer. In addition, the Model Penal Code text was adopted in 1962; the Commentaries were last published in 1980. With both dates coming well before the widespread use of instant messages, the value of the Model Penal Code and Commentaries to construe RSA 644:4, I(b) with regard to a communications technology that was little known at the time of their publication is minimal.

The juvenile next points to the statute's legislative history. In 1999, the definition of "communicates" in RSA 644:4, II was amended to amplify that imparting a message "by any method of transmission" specifically includes "electronic transmissions generated or communicated via a computer." Laws 1999, 141:1. We believe that the legislative history of the amendment supports a broader proscription than simply prohibiting multiple harassing e-mails, as argued by the juvenile.

House Bill (HB) 345-FN (proposing the language of the amendment) was entitled an Act "relative to harassment via the computer." N.H.H. R. JOUR. 302 (March 30, 1999). In support of the bill's passage, Representative Flora for the House Committee on Criminal Justice and Public Safety, stated:

> With the passage of HB 345-FN, the committee *adds harassment via a computer* to RSA 644:4:II. The bill *updates the statute to include current technological advances* and includes electronic transmissions communicated via a "computer."

*Id.* (emphases added). In legislative history provided by the juvenile, the Senate Judiciary Committee heard testimony from Representative Stone, the bill's prime sponsor, who stated:

> Basically, what this does now is give tools to the PD . . . to really enforce anything that happens as far as harassment over the internet.

SENATE COMM. ON JUDICIARY, HR'G ON HB 345-FN (May 19, 1999). At the same hearing, Representative Dolan, a co-sponsor of the bill, stated:

> The only change [to the statute] is they're including internet. Any form of communications where there is harassment involved, is prosecutable under the statute, this just gives the wording for internet . . . .
>
> . . . I think the people that used to harass people by the telephone are probably now going to use their computer to do it.

*Id.* In support of the bill's passage, Senator Trombly stated:

> House Bill 345 simply adds using the computer to harass people. The committee heard some horrific tales of people appropriating other people's names representing themselves to third parties and [a]ffecting people's jobs, their livelihood, interference with family relations. Because computers were not added to the harassment statute, they could not be prosecuted once they were caught, and this bill corrects something that is very much needed . . . .

N.H.S. JOUR. 1122-23 (May 27, 1999).

■ In sum, we believe the statute's legislative history indicates an intent to provide for a broad proscription against harassment via the internet, the electronic transmissions of computers, and the technological advances therein. Given our construction of RSA 644:4, I(b), we find no error on the part of the trial court. Of course, if the legislature did not intend this interpretation of RSA 644:4, I(b), it is free to amend the statute as it sees fit. *See, e.g., State v. McKeown*, 159 N.H. 434, 438 (2009).

*Affirmed.*

DALIANIS, DUGGAN, HICKS and CONBOY, JJ., concurred.