# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2023-0702, <u>N.E. v. J.Y.</u>, the court on September 10, 2024, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve the case by way of this order.  <u>See</u> <u>Sup. Ct. R.</u> 20(2).  The plaintiff, N.E., appeals a decision from the Circuit Court (<u>Carroll</u>, R., approved by <u>Guptill</u>, J.) dismissing his stalking petition against the defendant, J.Y.  The plaintiff argues that the court erred in concluding there was insufficient evidence of a "course of conduct" under RSA 633:3-a, II(a) (2016) based upon the court's erroneous interpretation of RSA 633:3-a, II(a) and prior caselaw.  We conclude that the court did not err in determining that the plaintiff failed to prove a "course of conduct" as defined in RSA 633:3-a, II(a).  Accordingly, we affirm.

## I.  Facts

The following facts are supported by the record or are otherwise undisputed by the parties.  The plaintiff is married to the former wife of the defendant.  The defendant and his former wife have eight-year-old twins.  On the morning of September 20, 2023, the plaintiff was responsible for driving the twins to school.  That morning, according to the plaintiff, the twins "weren't being very cooperative," and they were running late.  At one point, the plaintiff lifted one of the twins under the arms and, using several expletives, yelled at the child to hurry up.  Later that day, the defendant picked up the twins from school, and the defendant learned about what happened that morning.

That evening, over the course of thirteen minutes, between 5:59 p.m. and 6:12 p.m., the defendant and the plaintiff exchanged a series of ten text messages.  Their conversation went as follows:

> Defendant (5:59 p.m.): "If you ever put your hands on MY daughter again I will break your arms off!!!"

> Defendant (6:01 p.m.): "That's not a threat it's a promise!!"

> Plaintiff (6:02 p.m.): "I lifted her up.  I didn't hit her."

> Defendant (6:02 p.m.): "If you f***ing touch her again, I'm gonna f***ing pound you"

Plaintiff (6:04 p.m.): "Call Dcyf if you have a problem.. I'll wait."

Defendant (6:04 p.m.): "There's no do you need for DC why F I'm telling you if you f***ing touch her again, I'm gonna break your face"

Plaintiff (6:05 p.m.): "So I didn't do anything wrong enough to call the authorities, but you are threatening to assault me?"

Defendant (6:06 p.m.): "Yes, I'm promising you if you put my [sic] hands on my daughter again, I'm going to f***ing break your face"

Plaintiff (6:11 p.m.): "First I lifted her up because she wouldn't stop what she was doing. Then I yelled at her to move her ass. There, you have my full confession. I didn't lift her up any harder than I did to help her into the hay wagon."

Defendant (6:12 p.m.): "Great!"

On September 22, two days after the parties exchanged these text messages, the plaintiff filed a stalking petition in circuit court and was granted a temporary order of protection. A final hearing on the petition took place on October 16, and the court denied the petition the following day, explaining that it did "not find evidence of a course of conduct." The plaintiff filed a motion for reconsideration. In its order denying the plaintiff's motion, the court explained that it "continues to find that this is a text 'thread,' a singular event and not a course of conduct." This appeal followed.

II. Analysis

RSA 633:3-a (Supp. 2023) creates a civil cause of action for victims of the offense of stalking. See RSA 633:3-a, III-a (2016). As relevant to this appeal, stalking occurs when a person:

(a) Purposely, knowingly, or recklessly engages in a course of conduct targeted at a specific person which would cause a reasonable person to fear for his or her personal safety or the safety of a member of that person's immediate family, and the person is actually placed in such fear;
(b) Purposely or knowingly engages in a course of conduct targeted at a specific individual, which the actor knows will place that individual in fear for his or her personal safety or the safety of a member of that individual's immediate family; . . . .

2

RSA 633:3-a, I(a), (b) (2016) (emphases added).  Whether the defendant engaged in a course of conduct is a question of fact.  See State v. Gubitosi, 152 N.H. 673, 681 (2005).

The statute defines "'[c]ourse of conduct'" to mean "2 or more acts over a period of time, however short, which evidences a continuity of purpose."  RSA 633:3-a, II(a).  As relevant to the current appeal, "a course of conduct may include, but not be limited to . . . [a]ny act of communication, as defined in RSA 644:4, II."  Id.  In turn, RSA 644:4, II (2016) provides that:

> "[C]ommunicates" means to impart a message by any method of transmission, including but not limited to telephoning or personally delivering or sending or having delivered any information or material by written or printed note or letter, package, mail, courier service or electronic transmission, including electronic transmissions generated or communicated via a computer.

(Emphases added.)

On appeal, the plaintiff argues that the trial court erred in denying his petition because the "five distinctly worded and separately sent threatening text messages are sufficient evidence of a 'course of conduct' under RSA 633:3-a, II(a)."  The plaintiff maintains that the trial court's finding that the defendant did not engage in a "course of conduct" "conflicts with the plain and ordinary meaning of the words used to define 'course of conduct' under the Stalking statute" and is inconsistent with New Hampshire caselaw.  We disagree.

"We review sufficiency of the evidence claims as a matter of law and uphold the findings and rulings of the trial court unless they are lacking in evidentia[ry] support or tainted by error of law."  Comer v. Tracey, 156 N.H. 241, 246 (2007).  Resolution of this case requires that we consider the meaning of "course of conduct" under RSA 633:3-a, II(a).  This is a question of statutory interpretation, which we review de novo.  In re D.J., 176 N.H. 78, 81 (2023).  We interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id. at 81-82.

RSA 633:3-a, II(a) defines a "'[c]ourse of conduct'" to mean "2 or more acts over a period of time, however short, which evidences a continuity of purpose."  A course of conduct may include "[a]ny act of communication, as defined in RSA 644:4, II."  RSA 633:3-a, II(a)(7).  As relevant to this appeal, a "communication" for purposes of RSA 633:3-a, II(a)(7) means "to impart a

3

message by . . . sending . . . any information or material by . . . electronic transmission." RSA 644:4, II. The Oxford English Dictionary defines "impart" as "[t]o communicate as knowledge or information; to make known, tell, relate." Oxford English Dictionary, https://www.oed.com/dictionary/impart_v?tab=meaning_and_use#829566 (last visited Aug. 14, 2024). It defines the word "message" as, inter alia, "an oral, written, recorded, or electronic communication sent from one person, group, etc., to another" or "an expressed or implied central theme or significant point." Id. at https://www.oed.com/dictionary/message_n?tab=meaning_and_use#3739781 5 (last visited Aug. 14, 2024). Thus, "to impart a message" refers to the act of communicating or relating knowledge or information from one person or group to another, by way of an oral, written, recorded, or electronic communication, which may include a central theme or significant point.

We disagree with the plaintiff that each individual text message necessarily constitutes an "act of communication." RSA 633:3-a, II(a)(7). Although a single text message may, in and of itself, "impart a message" and therefore constitute an "act of communication," a series of text messages may also, depending upon the circumstances, "impart a message" and therefore constitute a single "act of communication" as well. RSA 633:3-a, II(a)(7); RSA 644:4, II. To conclude that sending an individual text message necessarily "impart[s] a message" separate and distinct enough to render each individual text message a single "act of communication" would ignore or overly simplify the reality of text conversations.

Applying this definition to the facts of the case, we conclude that there is sufficient evidence to support the trial court's finding that the conversation between the defendant and the plaintiff constituted "a singular event and not a course of conduct." See RSA 633:3-a, II(a). Here, the defendant sent six text messages to the plaintiff, four of which stated that the defendant would injure the plaintiff if the plaintiff touched the defendant's child again. Although all six of the defendant's messages were sent over a period of thirteen minutes, the four messages in which the defendant threatened the plaintiff were sent over a period of seven minutes. The fact that the conversation took place over a short period of time does not necessarily mean that only one act of communication occurred, see In re D.J., 176 N.H. at 82 (explaining that in In re Alex C., 161 N.H. 231 (2010), we rejected the notion that "a single conversation cannot contain repeated communications," and concluding that an eight-minute interaction involved more than one communication), but it nevertheless suggests that the four threatening text messages, taken together, constitute only one act of communication. Additionally, the conversation took place entirely by text messages, involved a rapid back-and-forth exchange between

4

the parties and involved the defendant expressing the same threat: that he would injure the plaintiff if the plaintiff touched the defendant's daughter again.

The plaintiff argues that such an outcome is at odds with our caselaw, particularly In re Alex C. and In re D.J. We disagree. In both cases, we considered whether a juvenile engaged in "repeated communications" pursuant to the definition of "communicates" set forth in RSA 644:4, II such that the juvenile committed harassment under RSA 644:4, I(b) (2016). In re Alex C., 161 N.H. at 234-38; In re D.J., 176 N.H. at 81-83. In Alex C., we concluded that the juvenile made "repeated communications," RSA 644:4, I(b), when he sent twenty separate instant messages over the course of fifty-six minutes to his friend's mother, during which the friend's mother sent only one message, and the conversation was interrupted by a forty-six minute break. In re Alex C., 161 N.H. at 233-34, 237. We explained that a conversation does not "necessarily equate[] to a single communication" and considered the process of instant messaging not necessarily as "a single conversation, but as a series of discrete electronic messages between two or more individuals." Id. at 238.

Alex C. does not, however, foreclose a finding that a single conversation may also constitute a single communication. First, in large part our conclusion in Alex C. relied upon the fact that there was a forty-six minute break when the juvenile did not send any messages. See id. at 234, 238 ("While a fifty-six minute telephone call between two people might not be uncommon, we think that a forty-six minute break during that call strains the meaning of 'conversation.'"). In contrast, here there was no substantial break in time and the conversation constituted a consistent, continuous back-and-forth exchange between the parties. Second, to the extent that Alex C. suggests that sending a single text message necessarily constitutes an "act of communication," we take this opportunity to clarify that a single text message may, but does not necessarily, constitute an "act of communication." RSA 633:3-a, II(a)(7); see In re Alex C., 161 N.H. at 237-38; RSA 644:4, II. In Alex C., we analogized sending an instant message to sending an email or leaving a voicemail. In re Alex C., 161 N.H. at 238. Although this analogy may hold true regarding text messages in certain circumstances, for example when a sender sends one or more text messages without receiving a response, it is not indicative of all text conversations. In many instances, such as the case at hand, a text message conversation in which parties exchange a series of text messages in quick succession and discuss one common subject is more analogous to a telephone or in-person conversation. Thus, whether more than one text message constitutes multiple acts of or a single act of communication depends upon the circumstances of the case, and is a question of fact best left to the fact finder. See Gubitosi, 152 N.H. at 681.

We are similarly unpersuaded that our conclusion is inconsistent with D.J. In D.J., we concluded that a juvenile committed harassment under RSA 644:4, I(b) when he engaged in an eight-minute verbal altercation with the victim. In re D.J., 176 N.H. at 80-83. While on his bicycle, the juvenile yelled a string of expletives at the victim after the victim informed the juvenile and his friends that they were not supposed to ride their bicycles on the sidewalk. Id. at 80. It was only after the victim responded to the juvenile's initial remarks that the juvenile then got off his bicycle, provoked the victim to fight, and took off his shirt. Id. We concluded that this series of verbal and non-verbal messages constituted "repeated communications" pursuant to RSA 644:4, I(b). Id. at 82-83. We explained that "if messages exchanged in a verbal conversation are sufficiently discrete, they, too, may be 'repeated communications,'" and thus "when an individual makes a verbal remark, rejects an opportunity to stop communicating with the recipient, and imparts another message, a break has occurred sufficient to make the communications 'repeated.'" Id. at 83. In contrast, here there was no shift in the timing or rhythm of the text conversation between the parties that suggests that one communication ended and a second one started.

For the foregoing reasons, we conclude that the trial court did not err in finding that the defendant did not engage in a "course of conduct" as defined by RSA 633:3-a, II(a). Here, the text conversation occurred over a very short period of time, the conversation involved a consistent back-and-forth exchange between the parties, each of the four threatening text messages sent by the defendant conveyed the same message, and there was no significant break in the conversation.

Affirmed.

MACDONALD, C.J., and BASSETT, DONOVAN, and COUNTWAY, JJ., concurred; HANTZ MARCONI, J., sat for oral argument but did not participate in the final vote.

**Timothy A. Gudas,**
**Clerk**